## In re TURRENTINE & THOMPSON.

District Court, N. D. Texas, Fort Worth Division.

Feb. 13, 1934.

Slay & Simon, of Fort Worth, Tex., for petitioners.

McLean, Scott & Sayers, of Fort Worth, Tex., for bankrupt.

JAMES C. WILSON, District Judge.

Turrentine & Thompson, a partnership, is doing a general job printing business, on rather a large scale. They do any kind of printing job, such as stationery, etc., large or small. This work is done by machinery, some of the individual pieces of machinery and presses each weighing more than a ton, and all of it electrically powered. This system of machinery is operated by employees, only in emergencies by the partners themselves, their regular work being supervision and the business management of the concern.

Revised Statutes of Texas 1911, art. 3785, subd. 5 (Rev. St. Tex. 1925, art. 3832, subd. 5), exempts, from execution, etc., to the head of a family, "all tools, apparatus and books belonging to any trade or profession." A question of exemption of such property, under this statute, is presented. Is such machinery, so driven by electrical power, apparatus? That is the important question, and rather a difficult one, to be decided. It arises out of these facts: August 9, 1932, the firm was indebted in the sum of five or six thousand dollars, unsecured, including $1,200, also unsecured, to F. G. Thompson, a brother of C. H. Thompson, one of the partners. On that date negotiations were closed for the

purchase by Turrentine, at a price of $4,000, of said partner's interest. It was arranged, at least Turrentine and C. H. Thompson so testified, that F. G. Thompson was to loan Turrentine $4,000 with which to pay such purchase price. So a mortgage was executed by Turrentine, on all of the machinery and fixtures, to F. G. Thompson, not only to secure the $4,000, but included the $1,200, making a total of $5,200. This brought on, within four months, the involuntary petition in bankruptcy by the petitioning creditors herein. They alleged that no loan was really made by F. G. Thompson to Turrentine; that, though in form it was real, in fact it was a bogus, simulated transaction, intended to and had the effect to delay, hinder, and defraud creditors. They urge also that the inclusion in the mortgage of the $1,200 was a preference, under Bankr. Act, c. 3, § 3a, Acts of Bankruptcy (11 USCA § 21 (a), and that, since the firm was insolvent, as alleged, they are entitled to an adjudication. All issues were submitted to the court.

 Despite the length of time this exemption statute has been in effect in Texas, and the many decisions by Texas and federal courts construing it, the law is still in a nebulous state as to what kind of machinery propelled by steam or electric or any power other than hand, if any, is exempt as "tools or apparatus of trade." This court, in deciding this question, is bound by the decisions of the Supreme Court of Texas and of the Circuit Court of Appeals of the Fifth Circuit. It is only in the event the question has·not been directly passed upon by these courts that this court is privileged to look to the decisions of the Courts of Civil Appeals of Texas, and then only as persuasive, since they are not courts of last resort. The Circuit Court of Appeals for the Fifth Circuit in the case of Peyton v. Farmers' National Bank, 261 F. 326, 330, where the case involved mill machinery propelled by electric motors, held, as follows: "Where hand power is used, the machinery is held to be 'tools or apparatus of trade'; but, where steam or any other power than hand is used, machinery so propelled is held not to be included within the statutory terms. There are decisions of the Courts of Civil Appeals of Texas which do not seem to observe the distinction." Judge Grubb, thus speaking for the court, was construing the decision of Chief Justice Gaines of the Supreme Court of Texas in Willis v. Morris, 66 Tex. 628, 1 S. W. 799, 803, 59 Am. Rep. 634, where it was said: "Expensive and complicated machinery propelled by steam-power, or any power other than hand, is not exempt as 'tools of trade;' the latter phrase being held to apply only to simple instruments used by hand. Thomp. Homest. & Ex. § 756. The word 'apparatus' used in the statute may take a wider range, and embrace such minor machinery as may be operated by hand, and such as courts of high authority have held not to be included under the term 'tools,' as used in similar enactments." The case passed upon by Chief Justice Gaines involved machinery and tools for the manufacturing of cotton gins which was claimed to be exempt upon two grounds, one of them being that such machinery was "tools or apparatus of trade." The question was directly presented in that case and the holding against the contention. Judge Grubb's decision was made in 1919 and Judge Gaines' in 1886. I am rather impressed that Peyton v. Farmers' National Bank, supra, gave a broader scope to Judge Gaines' decision than was intended by this language: "The word 'apparatus' used in the statute may take a wider range, and embrace such minor machinery as may be operated by hand. * * *" This must be read in the light of the times with respect to machinery at the time it was written. It was a holding that minor machinery propelled by hand was exempt, and that the heavy machinery involved in that particular case was not, but, as I view it, was not a holding that no machinery propelled by other power might not also be exempt as apparatus. It will be noted that Judge Gaines, in construing the phrase "tools of trade," held it "to apply only to simple instruments used by hand." By using the adverb only he very definitely limited its significance to simple instruments used by hand. However, in defining the meaning of the word "apparatus," he avoided the use of the adverb only and simply held it to "embrace such minor machinery as may be operated by hand." If he had used it, there would have been the definite limitation as given to it by Judge Grubb. It would appear that Judge Grubb construes apparatus to embrace only minor machinery propelled by hand. Many of the courts of Civil Appeals of Texas since the decision in Willis v. Morris, supra, have held, and I think properly so, machinery operated by steam, electricity, and other like power, to be exempt as "apparatus" under the statute. For example, in Hinckley-Tandy Leather Co. v. Hazelwood (Tex. Civ. App.) 35 S.W.(2d) 209, where electrically driven machinery, ordinarily seen in modern shoe shops, with a long shaft equipped with pulleys and belts, which, when in operation, turn emery wheels, brushes, sewing devices, etc., was held to be exempt as apparatus. Such

is minor machinery and seems to be typically apparatus under all the definitions given of the word by courts, as well as dictionaries. But a cobbler's business could increase to such proportions in the manufacture of shoes that his machinery would cease to be apparatus. Though numerous decisions might be cited where the Courts of Civil Appeals have held power propelled machines and mechanical devices exempt under the statute, none can be cited where ponderous power driven machinery such as we have here is held to be exempt as "tools or apparatus of trade." It is simply not apparatus under any definition. Though a liberal meaning is given to such statutes, to extend the meaning to include such machinery would be a lawmaking process. Attorneys for the bankrupt press for consideration, as controlling, all of these Texas decisions, some by the Supreme Court, where printing presses were held as exempt. As far as I know, all of them were hand operated, but, if the same presses were power operated, they might very properly be held to be exempt. But this does not mean that everything that can be called a printing press is exempt. The machines, weighing many tons, seen in our modern publishing houses, such as print our great daily newspapers, are printing presses, but they are not apparatus, and are not exempt. Just where and how the line of demarcation, between machinery power driven that is exempt, and machinery power driven that is not exempt, may be fixed by the courts, I do not know. It would seem, as here, that each case would be judged by its peculiar circumstances and facts, to determine whether the particular instrument, machine, or mechanical device, comes fairly within, or outside, the meaning of "tools or apparatus of any trade or profession." Certainly, in the face of the holdings in Willis v. Morris, and Peyton v. Farmers' National Bank, supra, this court cannot hold such power driven machinery as we have here to be exempt. First, because of those decisions; and, second, because I am impressed such holding should not be made. If so, there is no stopping place. For example, we have in Fort Worth large printing, stationery houses doing the same kind of business, on a still larger scale, with great rooms filled with ponderous machinery, the owners having practically nothing to do with such machinery, as here, engaging themselves almost exclusively, as here, with supervision and the financing and the management of the business affairs of the concern. Would the machinery in a great printing house like Clark & Courts, if owned by individuals, be exempt in Texas?

In their essence, there is no difference between that case and this. To exempt such machinery to such owners was never the purpose of the Legislature. Be that as it may, as long as those decisions stand, this court would have no option but to hold that the property here involved is not exempt.

The reason the question of exemption of this machinery is of primary importance is: (1) If exempt, the mortgage of $5,200 was not to hinder, delay, or defraud, since the right of no other creditor would be either defeated or impaired. No creditor, not secured by a lien on such property if exempt, would have any right to look to same for the collection of his debt. (2) If not exempt, that simplifies and aids materially to settle the issue of the alleged insolvency of the bankrupt, because, if the facts show the mortgage was given with intent to hinder, delay, or defraud creditors, under the Bankruptcy Act, c. 1, § 1 (15), Definitions (11 USCA § 1 (15), all such mortgaged machinery and fixtures must be excluded from the aggregate of the property, and, if what remains shall not, at a fair valuation, be sufficient in amount to pay the debts, the firm is deemed to be insolvent. Such machinery and fixtures constituted the major part of the assets. It is not contended that the partnership was solvent, if the mortgaged property is excluded. There is even doubt about the firm being shown solvent were such machinery and fixtures included. To hinder, delay, and defraud the creditors certainly was the effect of the mortgage, if the property was not exempt. As stated, the mortgaged property largely constituted the assets. Other creditors, if the property was not exempt, had a right to look to it for assurance and security. It was not in dispute that the firm, in a commercial sense, was insolvent, in that it could not pay its debts as they came due, nor that it was begging for and getting extensions when this happened. To blanket the most valuable properties with a mortgage, to protect the selling partner for his sale price and his brother for a pre-existing indebtedness, left a very discouraging picture for all of the other creditors not so closely related to the firm. Of course, to actually hinder, and delay, if not defraud, creditors was the natural consequence of it. It is difficult for any person to establish they intended differently from that which was the natural and only result of their act. Nearly a year has passed, and many of the debts, current in their nature, existing August 9, 1932, as they were then, are still pressing for payment. The manner of the execution of the loan and the payment of the purchase price of $4,000 for the half

interest, if indeed any such payment was made, furnishes abundant confirmation of the presumption naturally arising from results and the circumstances attending the transaction.

At the outset, this mortgage for $5,200 is tainted, in that it includes a $1,200 item obviously a preference of the brother as a creditor. The change of the status of this $1,200 item, by including it in the mortgage, was more apparent than real. Next, in the face of the economic conditions existing and particularly the state of this business, it was most unlikely that F. G. Thompson, if he had the money, would loan to Turrentine $4,000 cash, the full amount necessary to buy the half interest in the business, or that he would involve his credit to that extent. The natural thing, if some material advantage over other creditors was not to be gained, would have been for Turrentine to have given a $4,000 mortgage to C. H. Thompson, and, if he owed his brother, F. G. Thompson, any money, transferred such mortgage to him as security. But, the advantage was, if made directly to F. G. Thompson, it would appear on the record that he had loaned Turrentine the money, the purchase price of the half interest.

Here appear to be the facts as to how the matter was handled: That F. G. Thompson gave his check to Turrentine on the Continental National Bank of Fort Worth for $4,000; that Turrentine indorsed this check to C. H. Thompson; that F. G. Thompson had less than $2,000 in his bank account at the time; that C. H. Thompson deposited the check the next day, not in his account, but in the account of F. G. Thompson; that the following day the $4,000 disappeared from F. G. Thompson's account. With no explanation of these bank transactions and entries, and there were none, either by the Thompsons or Turrentine, the following conclusions are inescapable: That F. G. Thompson loaned no money to Turrentine; that the mechanics of handling it was a mere form devised to give a better appearance of valid security to the Thompsons, C. H. for the sale price, and F. G. for his prior loan. The only explanation attempted was by C. H. Thompson, that he individually had borrowed money from his brother and owed him money at the time, but such statements were entirely oral and nothing definite as to amount. So, my conclusion is that the mortgage transaction was simulated and to delay, hinder, and defraud creditors, and that the firm and the partners were insolvent at the time. However, such holding is with this reservation, that there was no actual intent not to finally pay other creditors. Turrentine has kept up the business and run it faithfully, apparently paying all indebtedness he could. I think he is actuated by entire good faith in this respect. In fact, so much was I impressed with this, it has looked to me, in view of present conditions, that the happiest solution of this matter, for all concerned, would be a voluntary cancellation of this mortgage and further extensions and indulgences by the creditors, all on equal basis, to give Turrentine a better opportunity to work this business out.

The petitioning creditors present another theory for a basis of holding that the firm was insolvent, relying on the provision of chapter 3, § 3d, Acts of Bankruptcy (11 US CA § 21 (d), to the effect that the burden of proof to show solvency, when such a petition is filed, is upon the bankrupt. It is true that the bankrupt did not produce in court its books, and it is further true that the showing on its part touching its solvency, even including the mortgaged property, was not satisfactory. The contention may be correct, but it is not necessary to discuss it, since the adjudication will be made on the ground heretofore discussed, and a form of order in accordance herewith may be submitted for my signature.